UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 22-cr-10255-RGS |
| CHARLES OCHI | |
| Defendant | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this memorandum in connection with the sentencing of the defendant, Charles Ochi. Ochi pleaded guilty to all counts of an Indictment that charged him with one count of money laundering conspiracy, one count of conspiring to conduct an unlicensed money transmitting business, and one count of operating an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1956(h), 371, and 1960, respectively.

The defendant's crimes of conviction arise from his illegal transmission of money, principally comprising the proceeds of various wire fraud schemes, first as a solo operator working with Tochukwu Edeh, his co-conspirator and friend, and later as a leader and organizer of no fewer than five money transmitters. He did so as part of an extensive operation that involved Ochi and his money transmitters, Edeh and his money transmitters, at least two other money launderers, numerous persons to whom Ochi and his launderers sent money, and the persons who perpetrated the underlying fraud schemes.

Through his criminal conduct, the defendant promoted the operation of these fraud schemes by receiving and disbursing stolen money in a manner designed to conceal and to disguise the nature and disposition of the victims' funds. The defendant's money transmitting business moved at least $1,168,189, of which $944,504 came from identifiable victims. The defendant kept as his

cut at least $141,021 of the proceeds that he and his crew of money transmitters received and transmitted in the United States. However, as detailed below, the defendant also received payments from Edeh in Nigeria, directly into his Nigerian bank account. The government cannot fully amount for money Ochi received in Africa, and the government's estimate of the defendant's take from his crimes undervalues their gravity.

There is no plea agreement in this case, and based on the defendant's objections to the Pre-Sentence Report ("PSR"), the defendant has not clearly demonstrated his acceptance of responsibility. Accordingly, for the reasons stated below, the government recommends a sentence of 80 months of incarceration, 3 years of supervised release, restitution in an amount to be determined, forfeiture of $141,021.49, and a special assessment of $300.

**OVERVIEW OF THE DEFENSE CONDUCT**

In 2016, the defendant graduated from Coventry University in England with a bachelor's degree in business information technology and moved to the United States. (PSR ¶¶ 77, 65.) From January 2015 to February 2018, he worked as a data analyst for First Bank Nigeria, and thereafter, he worked as a business analyst for companies in Texas. (PSR ¶¶ 80-86.) The defendant did not hold a money transmitting license in any state and did not register as a money transmitting business with the U.S. Department of the Treasury. (PSR ¶ 9.)

Starting no later than 2016, the defendant began transmitting money from fraud schemes in collaboration with his friend, Tochukwu Edeh. (PSR ¶ 11.) Initially, Ochi acted alone, but soon, the defendant was a leader and organizer of money laundering activity involving persons he recruited, including at least his wife, three friends, and a lover; his operation expanded beyond laundering for Edeh's client-fraudsters to include laundering for other fraud schemes. (PSR ¶ 10.) As discussed below, Ochi also engaged in illicit currency exchange business activity, in which he,

2

Edeh, and others bought United States dollars to exchange for Nigerian Naira on the black market.

For example, in July 2017, the perpetrator of the PrimeFx fraud scheme directed a Massachusetts victim to send her "investment" to a Chase Bank account owned by the defendant's wife. (*See* Exhibit 1.) That $3,000 wire arrived on July 5. That same day, the defendant's wife withdrew the money. That same day, Ochi deposited $3,000 into his own Bank of America account and transferred $2,500 back to a co-conspirator in Massachusetts. The defendant kept $500, or 16 percent of the victim's money. (*See* Exhibit A to Brown Affidavit (Exhibit 2); *see also, e.g.,* PSR ¶ 19).

Another example of the money laundering activity orchestrated by the defendant is a January and February transfer of funds from the MyFixTrade fraud scheme, which did not involve Edeh. Ochi ran this transfer through his friend, Diego Okeh, in January 2018. (*See* Exhibit B to Brown Affidavit.) In this instance, a victim wired $18,000 to Okeh. Okeh first withdrew $4,000 through a check payable to himself. Then he withdrew $12,200 and deposited it into Ochi's account. That same day, Ochi transferred $470 and $360 to co-conspirators,[1] and a week later, Ochi bought a check for $10,010 payable to a used car company (not owned by Edeh). (*See id.*)

Although Ochi performed money laundering transactions on his own (*see, e.g.,* PSR ¶ 19), he principally acted as a leader and organizer of laundering by others. Diego Okeh and Danielle Liggins have admitted under oath, for example, that they made transfers in the manner and at the times directed by Ochi. (*See* Okeh Statement ¶¶ 4-7 (Exhibit 3) (filed in *United States v. Diego Okeh,* No. 22-cr-10131-RWZ); and Liggins Statement ¶¶ 8-9 (Exhibit 4) (filed in *United States v. Danielle Liggins,* No. 22-cr-10152-IT)). For example, Ochi told Liggins to disburse monies she

---

[1] These are ▮▮▮▮▮ and ▮▮▮▮▮ in his objections to the PSR, the defendant admits that both were involved in laundering money with him. *See* PSR at 27.

had received in multiple transactions, usually involving cashier's checks. (*See* Ochi Messaging with Liggins (Exhibit 5) at 2-3, 5-9.)[2] A sample of Ochi's management of Liggins appears below.



As can be seen above, Ochi told Liggins what money was coming and who it was coming from and directed her when and how to disburse the money using two cashier's checks, deposited into one Bank of America account.[3]

---

[2] Ochi's instructions to Liggins demonstrate the extensive nature of his laundering operation. *See* Ochi Messaging with Liggins (directing transfers to at least five other persons).

[3] Ochi and Liggins received a total of $30,000 from this victim of the MyFixTrade scheme. Liggins disbursed the money to at least two persons designated by Ochi, as well as apparently to Ochi through a cash deposit of $3,800 into his account.

Ochi's structuring of transactions through multiple persons and channels, as well as his use of a business created by Liggins at his direction and of business accounts Liggins held (*see* Liggins Statement ¶¶ 5, 7), served to make recovery of victims funds difficult and to conceal and disguise the disposition of the stolen money. For example, Ochi told Liggins to break a $9,000 transaction into two parts. The first was to be a $6,000 transfer to him, and the second was to be a $3,000 transfer to another person who would then give the money to Ochi. (*See* Ochi Messaging with Liggins at 2.) Those transactions broke up and disguised the disposition of victim funds.

At times, however, Ochi's laundering of money was simpler and more direct. For example, in 2017, a Florida woman involved in a purported online romance decided, at the suggestion of her online romantic partner, "Lorenzo Lucca," to invest in cryptocurrency through an entity called, "Ultimate Investments."[4] She did not, however, send money to that entity. At the suggestion of "Lucca," she wired her $5,000 investment to Ochi. The wire entry from Ochi's Bank of America statement appears below.

| 10/13/17 | WIRE TYPE:WIRE IN DATE: 171013 TIME:1354 ET ▮▮▮▮▮▮ ORIG: ▮▮▮▮▮▮ SND BK:MIDFLORI DA | 5,000.00 |
|---|---|---|
| | CU ID: ▮▮▮  PMT DET: ▮▮▮▮ LORENZO L UCCA ULTIMATE INVESTMENT | |

Upon receipt of this money, which referenced a woman he did not know and mentioned "Lorenzo Lucca" and "Ultimate Investment," Ochi did not send the money to any investment company or to anyone named "Lucca." The transactions he then engaged in appear below.

| 10/13/17 | Online Banking transfer to SAV 9625 Confirmation# ▮▮▮▮ | -1,400.00 |
|---|---|---|
| 10/13/17 | Mobile/Email Transfer Conf# ▮▮▮ ▮▮▮▮ | -2,500.00 |
| 10/16/17 | TX TLR transfer to CHK 3512 | -1,000.00 |

He transferred $1,400 to his own saving account, and in two transactions, across three days, using two methods of transfer, he sent $3,500 to a person he has identified as a someone

---

[4] This scheme did not involve Edeh.

responsible for fraud.  Ochi kept 28 percent as his cut.  (*See* Ochi Bank of America Statement, September to October 2017 (Exhibit 6)).

The defendant also directed his money transmitters to take a cut of the money they transferred for him.  (*See* Okeh Statement ¶¶ 4 and 7(b); Liggins Statement ¶ 6; and Ochi Messaging with Liggins at 1.)  Ochi also took a cut of the money that his transmitters sent to him. In total, the defendant kept roughly $141,021.49 of the $1,168,189.39 in fraud and money transmitting proceeds that moved through his money transmitting business.  (*See* Brown Affidavit ¶¶ 10 and 12).  Ochi's remuneration from the scheme also included transfers to him in Nigeria from at least Edeh.  The government cannot determine the full amount of that remuneration, but transfer receipts from Edeh's Nigerian bank accounts to Ochi's Nigerian bank accounts show that Ochi received payments from Edeh in Nigeria into August 2020.  (*See* Ochi Nigerian Receipts (Exhibit 7)).[5]  That remuneration relates to Ochi and Edeh's partnership in funding illicit currency exchanges.  (*See* Ochi Messages with Edeh (Exhibit 8) at 64-69 and Message Detail (Exhibit 8.1)).[6] For example, Exhibit 8.1 is a message that Ochi forwarded to Edeh on August 20, 2020 asking to fund $100,000 to $150,000 in money laundering using cashier's checks.

## APPLICABLE SENTENCING GUIDELINES

The government agrees with the guidelines calculation in the PSR, before adjustment for acceptance of responsibility.[7]

---

[5] Exhibit 7 comprises bank receipts from Edeh's email account for 18 transfers from 2018 to 2020, totaling 8,107,636 Naira or roughly $22,303 USD.

[6] Exhibit 8.1 is the embedded filed in Ochi's message on August 20, 2020 in Exhibit 8, at 68.

[7] The United States submits that this memorandum, with its attachments, including the co-conspirators' sworn statements, the Brown Affidavit, and the defendant's statements, prove by preponderance that the enhancements in the PSR's calculation properly apply and that there is no need for an evidentiary hearing.  The United States will have witnesses available to testify at the sentencing on June 13, 2023 to rebut arguments made by the defendant, if necessary.

The defendant did not object to the loss calculation in the PSR. As calculated by the government, the enhancement under United States Sentencing Guidelines ("USSG") §§ 2S1.1(a)(2) and 2B1.1 for the value of laundered funds is based upon the monies moved by Ochi and his operation, comprising subordinate transmitters, but not Edeh's money transmitters, even though there were transfers between Edeh's arm and Ochi's arm of the operation. It is not clear whether or how much of Edeh's operation Ochi could reasonably foresee, in the same way that it is not clear that Edeh could reasonably foresee the full scope of Ochi's conduct with other fraud schemes. If Edeh's conduct were attributed to Ochi, the amount of the laundered funds in this case would be close to $3,000,000.

The defendant frivolously objects to the leader/organizer enhancement under USSG § 3B1.1(a). If a scheme involves five persons or is otherwise extensive, a defendant only has to lead or organize *one* person to be a leader or organizer. *See United States v. Arbour*, 559 F.3d 50, 56 (1st Cir. 2009) ("[A] defendant needs only to have led or organized one criminal participant, besides himself of course, to qualify as a leader or organizer."). A person is an "organizer" "if he coordinates others so as to facilitate the commission of criminal activity." *United States v. Tejada-Beltran*, 50 F.3d 105, 112 (1st Cir. 1995). By his own admission, Ochi was involved with five other transmitters, Edeh, ▇▇▇▇ and ▇▇▇▇ Okeh and Liggins have signed sworn statements attesting that Ochi recruited and directed them.[8] In addition, as noted above, Ochi's directions to Liggins independently show that he managed her activity and paid her a pittance; they also show that he instructed her to multiple additional persons, demonstrating the extensive nature of the operation. Moreover, analysis of bank records shows that Ochi's operation involved well over

---

[8] The government's motion to disclose grand jury materials pertaining to this issue is pending.

five persons and was otherwise extensive.    (*See* Exhibits to Brown Affidavit.)    The leader/organizer enhancement has to apply on these facts.  The defendant's objection is baseless.

The Court should not reduce the defendant's offense level for acceptance of responsibility. Application Note 3 to USSG 3E1.1 states that a defendant pleads guilty "is not entitled to an adjustment under this section as a matter of right."  Rather, the Court should consider whether, among other things, the defendant "falsely denies, or frivolously contests, relevant conduct that the court determines to be true."  USSG 3E1.1, Application Note 1.

In his objections to the PSR, Ochi claims that he has a minor role, denies leading or managing others, suggests that co-conspirators like Liggins who earned $1,000 per wire she received, with Ochi's permission, are more culpable, and contends he was always subordinate to Edeh—except when Ochi was laundering money for others—and that his involvement with Edeh ended by 2020.  The six Nigerian bank transfer receipts in 2020 (Exhibit 7) show that contention is false.    Similarly, the numerous WhatsApp messages between Ochi and Edeh in 2020 conclusively show that the defendant's objection to the PSR is baseless.  *See*, *e.g.*, Exhibit 8 at 8 (July 14, 2020, Edeh:  "Send Naira if anything is to be done."  Ochi:  "The 500.  I get the Naira."); at 37-42 (discussing money transmitting transactions); at 45 (sending Edeh an account for a person in South Dakota to receive money from Edeh).   The defendant's objections to the PSR are inconsistent with acceptance of responsibility, given the documentary evidence.

None of the other factors listed under USSG § 3E1.1 obtain in this case.  The defendant did not withdraw from criminal conduct or associations, he has not paid any restitution or offered to do so, he did not surrender to authorities, he did not turn in co-conspirators, he did not help the government recover victim funds, and it took him about year to decide to plead guilty.

Accordingly, the government submits that the defendant's offense level is 30, with guidelines sentencing range of 97-121 months.

## FORFEITURE

Forfeiture is mandatory for violations of 18 U.S.C. §§ 1956 and 1960. 18 U.S.C. § 982(a)(1). The statute requires that a defendant forfeit "any property, real or personal, involved in such offense." *Id.*; *see also United States v. Cox*, 851 F.3d 113, 128 (1st Cir. 2017). Unlike the forfeiture statute that applies to wire fraud, for example, Section 982(a)(1) is not limited to "gross receipts" that a defendant directly or indirectly "obtained." 18 U.S.C. § 981(a)(1)(D)(vi). The total money "involved" in Ochi's crimes that he could reasonably foresee is $1,168,189.39. (Brown Affidavit ¶ 10.) That is the amount of money that the defendant laundered directly or through the network that he managed.

The government only seeks $141,021.49 in forfeiture from the defendant. It previously submitted to United States Probation that the forfeiture amount was roughly $160,000, but due to lack of information about the disposition of certain funds, the government has reduced its forfeiture claim, which, to be consistent with the forfeiture sought in co-conspirator cases, is based only on the amount obtained directly by the defendant. The defendant objects.

To prove the amount of the forfeiture, the United States relies on the Affidavit of Jenna Brown (Exhibit 2), which attests to a financial investigator's methodology and calculation of the amount of money traceable to the crimes of conviction that the defendant retained.

## RESTITUTION

The United States has attempted to contact victims both directly and through alternative notification methods, which the Court allowed in the parallel case involving Tochukwu Edeh. *See* Docket Entry 56, *United States v. Edeh*, No. 21-cr-10293-RGS. In this case, restitution is

mandatory. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii) ("an offense against property"). With respect to the victims whom the government has identified to date (*see* Brown Affidavit ¶ 10), the United States cannot yet specify restitution amounts, in part because it continues to try to determine if any of the identified victims were money transmitting customers only. Such customers would likely not be victims within the meaning of 18 U.S.C. § 3663A(a)(2). At present, the government believes that all identified persons are victims. Moreover, given the overlap of this case with the *Edeh* case, it would be reasonable to defer a final restitution order here until proceedings against Edeh conclude in August 2023. Accordingly, the United States requests that the Court issue a preliminary order of restitution to any victims who make claims or the government identifies, but defer entry of a final order of restitution for 90 days, as allowed by 18 U.S.C. § 3664(d)(5). The United States further submits that given the potential complexity of the loss determination, it may be advisable for the Court to refer factual determination to the Magistrate Court with respect to this sentencing and the sentencing of Edeh, as allowed by 18 U.S.C. § 3664(d)(6).

## SENTENCING RECOMMENDATION

For reasons stated below, the Court should sentence the defendant to 80 months of incarceration, 3 years of supervised release, restitution in an amount to be determined, forfeiture of $141,021.49, and a special assessment of $300. The Court should not impose a fine, given the defendant's likely financial inability to pay both restitution and fine.

<u>Nature and Circumstances of the Offense / History and Characteristics of the Defendant</u>

The defendant is well-educated, had a professional white-collar career, and enjoyed economic opportunity in the United States. He could have earned a living legally and prospered, but he decided to enrich himself by taking a cut of the proceeds of fraud. The defendant's representation that he only acted to help people is nonsense. The defendant acted from greed.

## Seriousness of the Offense

Money laundering is an essential step in fraud schemes perpetrated from abroad. The fraudsters have to get their money, and that means moving money through networks in the United States to send it overseas. For Ochi, as for his co-conspirators, fraud was a business opportunity, and Ochi profited from victims' losses. The laundering techniques evident in the transactions that Ochi conducted and directed serve no purpose other than to thwart the ability of victims, banks, and law enforcement to recover stolen money.

There is no good faith innocent explanation for why Ochi, for example, would take a 28 percent cut of a $5,000 investment in Ultimate Investments or why he would send $3,500 of that investment to a co-conspirator in two transactions over the course of three days in two different ways, *i.e.*, mobile transfer and deposit into an account. Ochi's conduct was cold, calculated, and clearly criminal. He made $1,400 for disposing of the victim's $5,000. The victim got nothing.

She was but one victim of many, and the gravity of the defendant's crime is greater for the sheer number of victims and transactions that the scheme involved. Each money laundering transaction that Ochi and his crew carried out represents the lost earnings and hopes of average people who were trying to invest in the future.

## Adequate Deterrence to Criminal Conduct

Internet-based fraud schemes perpetrated from abroad are shockingly common, and what many of them have in common is a network of money launderers in the United States who help them obtain stolen funds. Money laundering is not a crime of passion or of economic duress. It is a crime committed because it can be lucrative at apparently very low risk. It is the kind of crime that courts have found especially need general deterrence. *See, e.g.*, *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("[W]hite-collar criminals 'act rationally, calculating and comparing

11

the risks and the rewards before deciding whether to engage in criminal activity' [and] . . . are therefore, 'prime candidates for general deterrence.'" (citations omitted). A meaningful sentence of incarceration will serve to disabuse the like-minded from following Ochi's path.

There is also a strong need for specific deterrence in this case and to protect the public from this defendant. The defendant's lack of remorse for the harm he caused bears directly on the need for punishment. Unlike a defendant who recognizes the social harm he caused and seeks to reconcile himself to the individuals and the community he has hurt, a defendant who minimizes the gravity of a crimes demonstrates a failure to understand that conduct has inflicted pain on others. It will not do to pretend that only the fraudster is culpable. Money laundering feeds fraud. Ochi could commit this crime from anywhere. It is a crime suited to working remote. The Court should impose a sentence that will impress upon Ochi that the risk is not worth the reward and that protects the public from him for a significant time.

<u>Available Sentences and Just Punishment</u>

A sentence of incarceration is the only appropriate sentence in this case. The sentencing data included in the PSR makes clear that courts around the country agree. The average and median sentences at an offense level of 27 are about 60 months. At an offense level of 30, the average and median length of sentences are 78 and 84 months, respectively.

The Court should consider that as in many cases, the largest single factor determining the offense level here is loss, but in this case, that loss comprises many, many victims. Ochi's is not the average crime. Unlike a money launderer who moves money from a handful of thefts, Ochi's crime involves large scale victimization—no fewer than 123 victims who lost their money because Ochi and his crew split it up and sent it out to the fraudsters.

12

The facts and circumstances of this case weigh heavily in favor of a meaningful term of incarceration.

## CONCLUSION

For the reasons stated above, the government requests that the Court impose the sentence the government recommends.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    /s/Kriss Basil
Kriss Basil
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/Kriss Basil
Kriss Basil
Assistant United States Attorney